Mr. Parsons. Thank you, Your Honor. Please record, I'm Gary Parsons. Kim Parsons, Amanda Hawkins, and I represent the City of Greenville and Officer Brandon Johnson. I figured I'd go straight to the area where probably one of our most fundamental disagreements with respect with the District Court's decision exists and that is the final two shots. The first eight shots, the District Court concluded the reasonable officer could have believed that they needed to use deadly force in that situation. The District Court found its most fault with the final two shots. If I may, what I'd like to do is set the stage because the cases which we're all familiar with say that we have put ourselves in the heat of the moment, and what I'd like to do is take us to the heat of the moment, if I may. Officer Johnson was alone. Mr. Rambert, at the time the first two shots were fired, had been charging at Officer Johnson for 14 to 15 seconds. Officer Johnson, we would respectfully say, did what he was supposed to do. When he first heard the shouting, he ran toward the danger. Then when he saw Mr. Rambert coming and sprinting at full speed, he did what he was supposed to do in other cases. He retreated, tried to put distance between him and Mr. Rambert. He retreated from the sidewalk down which both he and Mr. Rambert had been running, retreated into the street backpedaling. At that point, Mr. Rambert, instead of continuing down the sidewalk along his intended path, turned abruptly to the left and pursued Officer Johnson into the street. At that point, Officer Johnson had been telling Mr. Rambert repeatedly, sometimes perhaps a little too colorfully, that he needed to get on the ground. There was no decrease in speed. There was no decrease in the volume of the shouts. Finally, when Mr. Rambert was five to seven feet away, Officer Johnson fired three shots in the space of two seconds. This was at 4.09.14 and 4.09.15. Now let me make it clear. We submit that this rendition of the facts is uncontradicted because it all comes from the videotape. We're still on shots one through eight? Yes, ma'am. Do you quarrel with the District Court's opinion on shots one through eight? We don't quarrel with it from the standpoint of the conclusion that the District Court reached that a reasonable officer in that situation could have believed deadly force. Why don't we get to where there is disagreement? Shots nine and ten? Yes, ma'am. So at this point, because the shots had been fired, you have Officer Johnson on the ground. He has been wrestling for 13 seconds with Mr. Rambert. He finally manages to kick Mr. Rambert off of him at about 4.09.35 or 4.09.36. When he begins to sit up, you can see on the video that by this time, Mr. Rambert has come up. He's on his elbow. He's looking at Officer Johnson. He's been shot seven times at that point, correct? Seven shots have been fired, Your Honor. He was only hit a total of seven times, so we don't know how many. Eight shots have been fired and he was shot seven times. Well, ma'am, let me say, he was... How many times does he have to be shot at that point? He's bleeding and he's on the ground, correct? Yes, ma'am, but the specific point from the heat of the moment for Officer Johnson is he didn't know how many times he'd hit him or whether he'd hit him. What he knew was that Mr. Rambert had been sufficiently fit to wrestle with him for 13 seconds on the ground, and whether he had been shot or not, he certainly had demonstrated the ability to fight with Officer Johnson on the ground. Let me ask you this. I understand your interpretation of what the video shows. What if I disagree with the interpretation of what the video shows? It's not for this court to determine the facts, is it? Well, Your Honor, we'd respectfully say the historical facts are not contradicted. But they are contradicted here. Your Honor, let me say, if I may, nobody... No one has said that this videotape is doctored or inaccurate or that the facts that are depicted on the I think opposing counsel might say something different than what you just said, but I guess we'll hear from her when that time comes. Well, Your Honor, I'm sure opposing counsel will, but what I'm trying to say to you is the images on the videotape are historical facts. The videotape is not the clearest thing in the world, is it? It's not of Hollywood quality, Your Honor, I admit. But again, this is a body-worn camera on the officer showing us, we would say through the officer's eyes, what he was seeing. His eyes are here, the camera's here. If there is a question of fact, who decides that? If there is a question of fact, a historical fact on when was this shot fired? What was he seeing when the shot was fired? What had happened just before he fired the shot? Those would be questions of fact, but Your Honor, the uncontradicted testimony... I get, my question was, if there is a question of fact, who decides the question of fact? If there is a question of fact, Your Honor, obviously the jury decides it, but what we have here and would allude to Judge Scott v. Harris, a videotape that nobody says has been doctored, that shows through the eyes of the officer what he was seeing at the time, then there's not a question of historical fact. The question is objective reasonableness and was there a sufficient bright line that the officer had to either be incompetent for doing what he did or he had to knowingly violate the law. That is, no, he was violating a constitutional right and he did it anyway. And if I may, Your Honor, I'm trying to be kind of assertive about it, but I'm trying also not to be so assertive I'm disrespectful, so if I'm messing up, it's on me. But my point being, Your Honor, we can see what the officer saw and we can see that at 409-35-36, he separates from Mr. Rambert. At 409-37, they're both sitting up, but both are still on the ground. It's uncontradicted they were still on the ground, Your Honor, that was established. And are separated? They are separated, but they're both on the ground. As he comes up, he sees Mr. Rambert appearing to be getting up to come at him again. Now, what does he know at that point, if I may? He knows that when Mr. Rambert was four to seven feet away or five to seven feet away, he fired three times. Mr. Rambert got down, he got up and he was coming at him again in three seconds. He fired two more times. We can't see at that point because Officer Johnson's legs are in the way because he's on his back. We can't see whether Mr. Rambert went down again or whether he just kept coming. But what we do know is about two seconds later, when you can see Mr. Rambert again, he's on his feet and coming. Now, you can argue about whether that's stumbling or not, but the sufficient or the important thing for Officer Johnson is he's closing on him. So at this point, he fires two more. Well, first of all, he had fired a fourth shot in the air by accident. But by the time he fired shot seven and eight, then is the point at which Mr. Rambert lands on him, climbing up his legs, grasping his belt. And at that point, they fight. And from Officer Johnson's perspective, he was trying, and you can see it on the video, he's trying to keep his gun away from Mr. Rambert, and they're rolling back and forth. Now, the district court described the video as saying, well, it's hard to see what's happening because they're rolling back and forth. But what you do know is happening is from Officer Johnson's perspective, they are fighting. And at that point, they, after the struggle, and here's another central point I'd like to make, Your Honor, if I may. At this point, eight shots had been fired. Mr. Rambert had gotten up and kept coming every time. After shot seven and eight are fired, he's strong enough to fight with him for 13 seconds. When he was finally able to get him off of him, he's still in the same physical condition he was during the 13-second fight. At that point, he sits up. He sees him coming up again within a matter of one to two seconds. And in that matter of one to two seconds, it reasonably looks to him like, here he comes again. I have to do something else. And, Your Honor, we did two things trying to make the record clear. We did a slow-mo, I'm sorry. It reasonably looks to the officer like, here he comes again, because it's a fast-moving situation. I understand that would be the officer's testimony. But couldn't a jury or somebody else view it differently? Well, Your Honor, again, let me say that we're looking at bright lines here. And here, I would say this is happening so fast that there's not a bright line there for Officer Johnson having to make that decision in the space of one to two seconds. All of the cases that were cited by the District Court, and I think by the Plaintiff on Appeal, I'm sorry, all right, by the Plaintiff on Appeal, involved a vehicle driving by and the shots had been fired before and then they were fired when they got passed. Shots before, okay. Shots passed, not. The others involved situations where there had been separation, the officer is standing over. And that was a consistent theme, standing over, standing over. The shots that knocked the suspect off the porch onto the concrete patio. The shots that disabled, admittedly, the suspect. And then, when he's down, neither of them are getting up. Neither of them are demonstrating the ability to... I have an Alleman opinion, Fourth Circuit opinion, where there was also video footage, like here, but we found that there was still a question of fact. It was on the... The Fourth Circuit felt, and forgive me if you were on that panel, I'm not remembering, but if I remember, I don't like to describe an opinion to the author, I'm sorry, so I was missing. But at this point, Your Honor, what I would say is that, if I remember Alleman correctly, you had a situation where the suspect had been told again and again and again, drop the weapon, drop the weapon, drop the weapon. And what he is doing is standing in a position, surrender, holding the weapon up. If I'm misremembering and if I got the facts right, I've got a couple of them together and I mix them up and I apologize for that. He's holding the position in a surrender. When you have the... Yeah, so you're saying that in Alleman, the video itself shows that it could be subject to several different interpretations, but here, in your opinion, the video is pretty clear as to what's happening and so there's nothing for a jury to interpret. Respectfully, Your Honor, yes, that's exactly what I'm trying to say with too many words. Um, did you have a question? Right, okay, go ahead. The other thing I would respectfully ask the court to do is to take a look at the district court's conclusion on objective reasonableness. Again, we would say these are bound together the same factors that would have this court arrive at a favorable conclusion for Officer Johnson on the... And in fact, the district court didn't enter a partial grant and partial denial of summary judgment. It was denial of summary judgment across the board, which to me would indicate four shots, one through nine for all of them. Because there's not a partial... I understand there's that language that seems to bound for shots one through eight, I guess it is, that the officer's actions were reasonable, or at least supported by clearly established law. But the district court nonetheless didn't grant summary judgment as to those shots. The district court denied summary judgment across the board. So for the whole thing, what are we... There's not really a distinction between shots and the district court's ultimate order, ultimate conclusions. So what do we do with that? Well, what we've asked the court to do in our briefing, first of all, is to reverse the district court for not granting partial summary judgment on the first eight shots, and then to reverse the district court's order on the last two shots. Because frankly, this is all a fast developing situation. It's happening so quickly that you don't have the bright line, the separation in time that you have in the cases the district court relied on, and I am down to seven minutes of overtime. Seven seconds, I apologize. So you have some time, I'm rebuttal. Judge Traxler, do you have any questions before Ms. Sisson? I think he said no. All right, thank you. Good morning, and may it please the court. My name is Katherine Edwards, and I'm here on behalf of plaintiff appellees, the parents and co-administrators of the estate of Sean Rambert Jr. We ask this court to affirm the district court's denial of qualified immunity or to dismiss this appeal on the grounds that the district court found that qualified immunity hinged on material disputed facts. The defendants have suggested both today and repeatedly in their briefing that this discussion that just occurred is really illustrative, I believe. There is a video in this case. Right, that's what I was going to say. There is a video, so why isn't the video the version of the facts we look to? It's objective. It's a video. It's from the officer's perspective. The video itself is an objective piece of evidence, certainly, but it's open to discussion. In the Alleman decision recently, the court found at page 51, it's a lengthy decision, that a reasonable jury, one, could review and interpret the video footage, consider the other evidence, and decide that Galindo did not pose an immediate threat to Officer Ghira or anyone else at the moment Ghira shot him, and two, a reasonable jury could also find that Ghira fabricated his account of the fatal shooting, and also that a reasonable jury could find that Ghira mistakenly perceived that Galindo posed an immediate threat, but that Ghira's mistake was not reasonable. That video was actually quite clear. This video is not so clear. The video in this case is very dark, very grainy. There are moments, and the district court found this, that there are several moments throughout the video where you couldn't quite tell what was happening, including this interaction on the ground. That's exactly what the district court calls it, by the way. The district court says specifically that, this is at JA 696, that after this, the footage becomes confused, although it is clear that I believe the defendants have really strayed from the record in the court's findings, because they're asking the court to accept the defendant's version of the facts, that there was some fight on the ground. I'm sorry. Go ahead. Just kind of as a structural, starting with a structural approach, and I certainly appreciate the district court didn't have the benefit of our Armstrong recent decision, but it seems, at least under that decision, that the question of objective reasonableness is for the court. Do you dispute that? Absolutely not, Your Honor. I think that's correct, but I think there is a really important structural component to that that you point out. The Armstrong decision, as you well know, says that when facts are settled, the question of objective reasonableness is for the court, but that is why Judge Flanagan's decision here is quite consistent with Armstrong, because what she's saying is the facts are not settled. Again, I'm not trying to criticize the district court, because that came later, but it seems to pretty, to me at least, attribute the decision of reasonableness to be one the jury makes. Now, that's a separate issue about whether even if that might have been inconsistent with our law, do we have historical facts that are well settled? I certainly get your argument that parts of the video are sufficiently unclear, but I think that's our inquiry. Are the historical facts that we do know, given that there may be some lack of clarity, are the historical facts that we do know enough to ask? Do you agree with that framing? Yes, your honor. I do agree with that structurally, but I don't think that's what the district court decided here. I think the district court pointed out numerous facts, and each went through great pains, in fact, to go through the disputed facts that are at issue and have bearing on the qualified immunity, and objective reasonableness analysis obviously is part of the qualified immunity analysis. For each volley of shots, I call them volleys, that's sort of how we've referred to them throughout this case, but sort of group of shots, each decisional point that the officer made, which the court found to have been four. First of all, those factual disputes, the finding of those factual disputes is not reviewable by this court, but second of all, I think that the... Let me just, I mean, we're reviewing, I think we do look at the record, and we view, and we do determine whether the undisputed historical facts are enough for us to decide whether the officer's conduct was objectively reasonable, and if the district court said differently than that, I mean, we certainly, we're not bound by that. You agree with that, correct? To the extent that this is an interlocutory appeal, so to the extent that this court is reviewing findings of law by the district court, I do agree with that. To the extent that the court is reviewing findings of fact by the district court, the district court's view of the facts in favor of the plaintiff, I think Johnson v. Jones removes this court's jurisdiction to do that on interlocutory appeal on qualified immunity, but I would also say that I think the language to which you're referring in the opinion is this language where she goes through factual disputes and then says, you know, the jury may find that it's unreasonable based on their findings of these disputed facts, right? And to me, that still is in line with the Armstrong opinion because a predicate part of rendering a jury verdict in this case is going to be deciding excessive force. I mean, there are sort of two verdict forms that a jury in this case will see. One is this general verdict form where they're going to decide, was there a violation of 1983 to begin with? I'm not sure you're right about that after Armstrong, but that may be your view. Well, it is, Your Honor, and I think that's been what courts have done. For example, while the Fourth Circuit doesn't have model jury instructions, there is a Third Circuit model jury instruction. Many of our sister circuits do. The Third Circuit model jury instruction, which was updated earlier this year, says in determining whether defendants acts constituted excessive force, you, meaning you the jury, must ask whether the amount of force defendant used was the amount of force with which a reasonable officer would have used under similar circumstances. If you're arguing that is the way a jury should decide the question, you're arguing Armstrong is wrong. Well, actually, I'm not, Your Honor. What I'm arguing is that Armstrong is, first of all, is at summary judgment, not at the jury stage. If you don't ask the jury to render any verdict as to 1983, I think that would be rather novel throughout this country, but certainly within this circuit. I do think, however, that the special interrogatories that Armstrong talked about are commonly used throughout this circuit. I know Judge Flanagan uses them and has used them in recent cases, and she uses those to then look at following behind the jury. If the jury doesn't find in the plaintiff's favor, none of this really matters, right? But if the jury does find in the plaintiff's favor, the officer can still be insulated from liability on the basis of qualified immunity. And my reading of Armstrong, but of course you would know best, would be that Armstrong is consistent with that, with then using special interrogatories to find facts that could insulate that officer with qualified immunity on either prong. I think the special interrogatories can go to either. I could switch gears a little bit and ask you about clearly established prong of the qualified Brockington that talk about sequence, you know, different aspects of a sequence. And they seem to require, I think the language from Brockington was a clear break in the sequence. And I think your colleague talked about those cases that, one, Waterman has a car that's passed from coming towards the officers to going past them. Harris has allegations at the 12B6 stage where the officer is standing over the victim, over the defendant. In Brockington, that's what the facts are, too. I know you argue there's a sequence there, but do you have a case that's the most factually similar case you have to the sequence of events we have here? Well, I think that Harris is probably the most factually similar, but obviously, you know, I also think that resolution of, well, first of all, resolution of the clearly established prong for all of these shots, by the way, you could look to this being both an obvious case and one that is manifestly included within more general applications of these core constitutes. You said for all of the shots. So for shots one through eight, why wasn't the officer's conduct there reasonable when he's faced with somebody charging him in the dark and refusing to quickly unreasonable? Well, the first three shots, Your Honor, were generally in those circumstances. However, the district court found, and if you watch the video, you know, this is the plaintiff's interpretation of this video. The jury is going to hear that this man was schizophrenic. He had no criminal history. He had no violent history, but the officer doesn't know that. The officer knows that somebody is charging him in the dark and refusing to comply with commands. Correct, Your Honor. And that is why the district court found that a reasonable officer in his position, this is at JA-689, could have concluded that Rambert's mental illness was the cause for the 911 caller described conduct. So from plaintiff's view of the facts, what Officer Johnson was facing at the time was a man who is running toward him. He knows that he's unarmed. He knows that he's in mental distress, and he candidly is looking for help. And there's no verbal threats. There's no physical threats. How does the officer know he's looking for help? Well, because he's in mental distress and he just appears to be. I think it's an interpretation of the video, Your Honor. But as to the final shots, you know, we're looking to what the district court found to have been the facts in the plaintiff's view, which was that these final uses of deadly force are ones which a reasonable juror could conclude were excessive as they occurred after an unarmed man had been shot at least three times by an officer who managed to separate himself from the individual and was regaining his footing more quickly than the badly wounded suspect, if the video footage is viewed in the light most favorable to the plaintiffs. So I think, first of all, is there a separation? That's a question for the jury. That's a factual question, and that belongs squarely with the jury. Is there, and actually I don't think there's a huge dispute about that, there was a physical separation prior to the prior shots. There was a temporal separation as well. And the question of what the relative positions of the officer and Mr. Rambert were at the time, I think is also very open to interpretation. Officer Johnson says that he was getting up more quickly, he was regaining his footing as the district court found. If you look at the video, he does appear to be pointing his gun and looking downward at Mr. Rambert at the time. So again, that is, I believe, very much open to interpretation and falls within this court's prior decisions. But they're the decisions you're talking about to the extent we're not talking about obviousness. Are the decisions you're talking about Waterman, Harris, and Brockington? Yes. I mean, obviously, Waterman established the principle that the justification for deadly force can fall away in mere seconds or moments. And so that case isn't directly analogous in terms of the facts. But I mean, this court determined in Franklin earlier this year that in order to look at what was clearly established, the court must consider not only specifically adjudicated rights. I understand the specificity with which the defendants are asking this court to compare previous cases. That's what the Supreme Court asks us to do. Well, it's not only specifically adjudicated rights, but it's also those that are manifestly included within those general principles. And in Franklin, the Fourth Circuit said that we expect police officers to use reason, and of course we do. In some cases, if X is illegal, then Y is also illegal, despite factual differences between the two. And those relatively minor factual differences should have informed this officer that these actions were illegal, especially the final two shots. But candidly, Your Honors, all of the volleys were a violation of clearly established law. And how, again, were the first eight a violation of clearly established law? The first eight shots? Well, because again, if you look at the shots in the light most favorable to the plaintiff, the first three were done against an unarmed man who was not necessarily the suspect of any crime, by the way. Officer Johnson says he didn't even know if this was related to the breaking and entering, running towards him in apparent mental distress. And I think looking at that video, a reasonable jury could conclude that he just panicked. As opposed to treating this as both expert and the district court said, as opposed to treating this as a non-deadly force scenario and that required non-deadly force strategies, he instead forgot his training if he had appropriate training. And has appellant conceded that the officer knew that the man was of the extent to which he knew. The court found that he should have known that he was unarmed. A reasonable officer would have known that he was unarmed. But that is a dispute of fact based on he does concede that he did not see any weapons on him, but in his depositions stated that he thought that it may have been, he may have had a weapon because this was related to the breaking and entering, but at the same time, he also, then we're left with the middle of the night responding officer, a man charging at him in some sort of distress that may or may not have a weapon but was not compliant with the officer's commands. Well, your honor, I would say if you're viewing the facts in the light, most favorable to the plaintiff as we must at this stage, that he was unarmed and that he knew that he was unarmed. I would also just want to touch on one related issue, which is that if any of the volleys of shots were unreasonable, as the district court found, or a jury might find facts on which the court can find they were unreasonable, that does not preclude the claims against the city. This is sort of a tangential issue. Those claims were not dismissed at the district court level because qualified immunity was denied, but I do just want to note that the denial of qualified immunity on the clearly established prong does not require dismissal of Monell claims because reckless indifference in supervision, policymaking, or training don't necessarily rely on clearly established law. They can also rely on facts that were known to the agency or the municipality at the time. So, for all these reasons, we would ask that the court either affirm the district court's denial of qualified immunity or dismiss this appeal for lack of jurisdiction unless the court has further questions. All right, thank you. Does Zachary have a question? You have a question? All right, I'm sorry, Judge Traxford, go ahead. My question is, Ms. Edwards, in the plaintiff's view of the facts in this case, what would have been a reasonable way for this officer to handle this situation? It's a great question, your honor, and our expert actually opined on this. His testimony is, he has an entire expert opinion, which is part of the record. He actually trains police officers on this very issue and has stated that. I've read that, and what's the answer to my question? Yes, your honor, that he should have holstered his weapon and used a number of non-deadly techniques, recognizing that this was a non-deadly threat that he was faced with, and the distinction between non-deadly threat and deadly threat. Could you be specific as to exactly what non-lethal method he should have used? Sure, well, there were, there were tactic, well, repositioning tactics, verbal tactics. Verbal tactics weren't working. Go ahead. Verbal tactics weren't working at the time, but using constraint tactics or even non-deadly force. I think. Such as what? Sure. Real terms, what should he have done? Well, he constrained the, constrained Mr. Rambert physically. If he's unable to do that, pepper spray, tasers, non-deadly batons, non-deadly weapons that are used on a regular basis and that these officers are trained to use in these exact situations. Did this officer, did this officer have a taser? Your Honor, I believe he did, but I don't know that for sure. I apologize. I do know that he had pepper spray. Okay. Thank you. You've answered my question. All right. Thank you. Thank you, Your Honors. Mr. Parsons. Taking the last, taking the last point first, if I may, Your Honor. The record's clear from Officer Johnson's deposition that he had pepper spray. He did not have a taser. He did not have a baton. The second thing is, the plaintiff's just said their most significant case, the one that would establish their bright line, the one that would establish that the Officer Johnson knew or should have known, is Harris and Harris precisely was a situation in which they fired the first shot, lifted the plaintiff off their feet, they landed, I think, below on concrete, and then they stood over him execution style and fired. That is not our situation here, as a matter of fact, Your Honor. When you look to the appendix to plaintiff's responses to the local Rule 56.1 statement, at appendix page 585, the plaintiff did not dispute that shot number five was fired while Officer Johnson was still on the ground at 409-38. They also say it is undisputed that Officer Johnson was still on the ground when he fired shot number 10 at 409-39. They then say on page 586 that after firing number 10, Officer Johnson began getting to his feet and by 409-40 was once again standing. Is that after the last shot was fired? Is that what you're talking about when in the video after he has stood up? I think Mr. Rambert attempts to get up. Is that what you're saying? Yes, sir. He tried to get up and let me see. I've got to I can't call out the times which you can see it on the tape, but I can tell you what it did. Officer Johnson gets up, backs away. This is the first time he's been on his feet since he fell when he tripped backpedaling. He backs away. Mr. Rambert, after about 30 seconds at around 409-07, I mean 410-07, 410-10, gets back to his feet, takes, and I counted them several times, eight steps. Were they shuffling steps? Yes, but he takes eight steps toward Officer Johnson. Officer Johnson backed up and said he didn't perceive him to be a deadly threat at that time because he thought he was an imminent threat at the time because he thought he was going to fall. He, sure enough, did fall, but then after a few seconds, sat up one more time and then fell. So what that indicates to Officer Johnson is the level of determination that Mr. Rambert had to get to him, barely. Also, on the issue of the mental illness, again, if I'm running the risk of telling you things you already know, but I'm going to try it anyway. On the mental illness thing, the key is not whether you know they're mentally ill or not, but what is the behavior? If the behavior had been, help me, help me, I'm confused, holding on to a stop sign post, like in the Estate of Armstrong case, where they were calm and quiet, like the Wilson v. Prince George County, where they're not moving, like Clem, where there was pepper spray in the man's eyes, he was grabbing his eyes and stumbling around. The other officer agreed that the plaintiff was disabled and not being aggressive after the pepper spray. So we would say here the behavior is 180 degrees from that, in which the court has said that you adjust the level of force because of knowledge of mental health. Also, the comment about Mr. Rambert suffering from schizophrenia, Officer Johnson did not know that. His comment was, I heard him shout and scream. I looked at him. I thought he might be on drugs or he might be having a manic episode. He did not say mental health, he said a manic episode, which officers on the street have, I'm sure, been attacked plenty of times by people in those situations. So he had very little time to try to sort out what he was going to be faced with here. Also, the District Court's conclusion about reasonableness, the District Court said repeatedly, some or all the gunshots were not reasonable at 686. Initial three shot value was a reasonable amount of force at 694. They said a jury could conclude those things. And then a jury could conclude at some point that deadly force was excessive under circumstances. Again, Your Honor, under the Armstrong opinion, those are questions of law. I'm into overtime again. I think time for me to go. Well, thank you for your argument. We'll come down and greet counsel and adjourn court for the day. Thank you, Your Honor. Thank you.
judges: Stephanie D. Thacker, A. Marvin Quattlebaum Jr., William B. Traxler Jr.